Gregory Arthur OTT, Appellant,

v.

The STATE of Texas, Appellee.

No. 2–81–028–CR.

Court of Appeals of Texas,
Fort Worth.

Dec. 30, 1981.
Rehearing Denied Jan. 27, 1982.

Jackson & Levy and Hal Jackson, Denton, for appellant.

Jerry Cobb, Dist. Atty., Denton, for appellee.

Before HUGHES, JORDAN and RICHARD L. BROWN, JJ.

## OPINION

JORDAN, Justice.

Gregory Arthur Ott was indicted in Denton County, Texas, for capital murder of a peace officer and on May 30, 1978, was found guilty by a jury of murder, a lesser included offense of the indictment. He was assessed punishment by the same jury at confinement in the Texas Department of Corrections for life. He appeals on thirty-five grounds of error.

We affirm.

On the late evening of February 20, 1978, six peace officers, accompanied by an informant, one James Leonard Baker, went to the residence of appellant near Argyle, Denton County, Texas, for the purpose of purchasing marihuana from appellant and arresting him for selling it. The peace officers included a captain of the Denton County Sheriff's Department, two Denton County Deputy Sheriffs, two narcotic agents of the Texas Department of Public Safety, and Bobby Paul Doherty, a Texas Ranger. The officers had been informed by James Leonard Baker that appellant would sell them marihuana. After arriving at appellant's residence narcotic agent Ben Neel of the Texas Department of Public Safety and Baker went in the house to talk to appellant and to arrange a marihuana buy. While they were inside the house with appellant, making the buy, the other five officers waited in the pickup truck in which they had arrived. A noise accidentally caused by one of the officers outside the house alerted Gregory Ott and gunfire ensued. The testimony was that there were two shots fired, one by agent Ben Neel and one by appellant which the state alleged killed Texas Ranger Bobby Paul Doherty. This alleged fact was proven by the State to the satisfaction of the jury, and appellant was convicted of the murder of Bobby Paul Doherty.

In his first two grounds of error appellant complains of the exclusion by the trial court of certain cross-examination testimony of Agent Ben Neel, offered for the purpose of showing bias and motive for testifying as he did. Such testimony would have shown first that at some unspecified time either before or after the February 20, 1978, incident, when Ranger Doherty was slain, Agent Neel was suspended by the Texas Department of Public Safety pending investigation of the disappearance of $9550.00 from the trunk of his car. The other testimony offered by appellant and excluded by the court concerned a 1973 drug arrest in Houston, Texas, where a suspect was shot and killed by Agent Neel.

It is appellant's contention on appeal that both incidents would have shown bias on the part of Agent Neel and that his testimony against appellant about the shooting of Ranger Doherty was probably colored and biased because of Neel's past difficulties. The contention is that because of these two incidents, Neel would be trying to make a better impression on, and to curry favor with, his superiors.

With respect to the suspension because of the $9550.00 missing from the witness's car trunk, earlier in February, 1978, appellant was allowed to prove up a bill of exceptions when the trial testimony was concluded. On the bill of exceptions Neel testified that on February 2, 1978, it was discovered that $9550.00 of money belonging to the State of Texas, used for undercover narcotics work, was missing from the trunk of Neel's car. An immediate investigation was launched, as a result of which Neel was suspended for five days from his job without pay. However, his testimony was that at the time of the February 20, 1978, incident when Ranger Doherty was killed, all he knew was that there was an investigation pending; as far as he could remember he had not, as of February 20, 1978, been notified of his suspension. The investigation into the missing $9550.00 was still pending at the time of this trial in June of 1978. There was no evidence of the reason for the suspension, other than that the money had been in

Neel's car. There is nothing to indicate that Neel was accused of taking the money or whether he was suspended for negligence or for some other reason. He was never charged with any criminal offense as a result of this incident.

The proffered testimony relating to the 1973 drug incident when a suspect was shot and killed by Agent Neel was very brief and sketchy. It was taken on a bill of exceptions, but showed only that another police officer was wounded and that a person named Webb was shot and killed by Neel during a "drug incident in Houston" in 1973. Appellant's counsel did not, on the bill of exceptions, elicit other testimony from Agent Neel which would have shed more light on the incident. No details about the "incident" nor about the shooting of Webb were elicited. There was nothing to show any similarity between that incident and the one involved here.

We do not believe there was any error in the trial court's exclusion of any of this testimony, because all of it was on collateral matter, not material in any way related to the issues of this trial. If there was error it was not preserved for appeal. Appellant at no time objected to the action of the court in refusing both the testimony as to the suspension and as to the 1973 Houston "drug incident" where a person was shot and killed. He not only failed to state specific reasons for his objections to the actions of the court, but failed to object at all. Appellant attempted to show that Neel had been suspended at some time as a result of losing the money from the trunk of his car. The State's objection to this line of testimony was sustained and appellant at that time neither objected to the ruling of the court or explained the materiality, importance and admissibility of this testimony. He later took a bill of exceptions relating to this testimony at which time Agent Neel testified that at some time he was suspended for five days without pay pending the investigation into the missing money. He was not sure, and he did not testify, as to whether he learned about this suspension before or after the February 20, 1978, incident involved in this case. He in fact said that he thought it was after the February 20, 1978, incident, sometime in March, 1978, that he learned officially about the suspension. He admitted that he knew on February 20 that he was under investigation. At the conclusion of Neel's testimony on his 1978 suspension on the bill, counsel for appellant passed the witness and at that time never reoffered the testimony, objected to its exclusion, nor gave the court his reasons why the testimony was material and admissible for impeachment purposes.

With respect to the other proffered testimony on the 1973 Houston "drug incident", appellant's counsel asked Neel, "did you ever work with the Houston Police?" The State's objection to this as irrelevant was sustained and appellant took a bill of exceptions on this line of testimony. Neel simply testified on the bill that in 1973 in Houston he was involved in a "drug incident" which resulted in two officers being wounded by gun fire and a man by the name of Webb being killed. Neel testified that he shot and killed Webb at this time. This was the extent of this testimony. There was no testimony as to the circumstances, whether Neel was acting illegally or improperly, or whether he was charged or accused of the killing of Webb.

When he was through with the witness, Mr. Jackson, counsel for appellant, said, "That's all we have on the Houston incident, Your Honor." He did not offer this testimony, made no objection whatever, specific or otherwise, to the exclusion of this testimony, and did not state any reasons for its admissibility.

Appellant did not argue, as he does in his brief on appeal, that the testimony both as to the 1978 suspension and the 1973 "drug incident" was admissible for impeachment purposes to show bias or improper motives.

■ Ordinarily, specific acts of misconduct against a witness are not admissible for impeachment purposes. *Sparks v. State*, 366 S.W.2d 591 (Tex.Cr.App.1963); *Gibbs v. State*, 385 S.W.2d 258 (Tex.Cr.App. 1965). Evidence of specific misconduct is admissible, however, for the limited purpose

of showing bias, prejudice, interest and motive of the witness in testifying as he did. *Randle v. State*, 565 S.W.2d 927 (Tex.Cr. App.1978); *Evans v. State*, 519 S.W.2d 868 (Tex.Cr.App.1975).

The extent to which a witness may be cross-examined for the purpose of showing bias on a collateral matter rests within the sound discretion of the trial judge. *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931); *Cloud v. State*, 567 S.W.2d 801 (Tex.Cr.App.1978).

The trial judge must balance and protect the probative value of the proffered evidence against the potential risks its admission may entail. The potential risks include the possibility of undue prejudice, embarrassment or harassment to either a witness or a party, and the possibility of misleading or confusing a jury, and the possibility of undue delay or waste of time. *Howell v. American Live Stock Insurance Company*, 483 F.2d 1354 (5th Cir. 1973); *Cloud v. State, supra.* The last cited case is similar to this one. In *Cloud* The Texas Court of Criminal Appeals held that the trial court did not abuse its discretion in refusing to permit defendant's counsel to attempt to impeach a police witness by questioning him concerning an incident wherein he was suspended without pay and transferred from the vice squad to the traffic section for allegedly having filed a false report about another officer.

We do not think that the proffered evidence concerning the 1978 suspension for five days or the 1973 "drug incident" was relevant or material to impeach Agent Neel in his testimony as to the shooting incident on February 20, 1978, which resulted in the death of Texas Ranger Bob Doherty. All of such testimony was on strictly collateral matter, not related in any respect to the February 20, 1978, shooting. Accordingly, the trial judge did not abuse his discretion in excluding such testimony.

However, if there was any error in this regard, we hold it was waived because in neither case, the 1978 suspension incident or the 1973 "drug incident", did appellant object, either specifically or otherwise, to the action of the trial court in excluding it. Any error was waived by appellant. See *Rawlinson v. State*, 487 S.W.2d 341 (Tex.Cr. App.1972); *McIlveen v. State*, 559 S.W.2d 815 (Tex.Cr.App.1977).

Although he made no objection to any of this evidence at trial, in his brief on appeal he argues at length that the testimony was admissible to show bias and improper motive on the part of Neel. However, the ground of error in an appellant brief must comport with the objection made at trial. *Graham v. State*, 546 S.W.2d 605 (Tex.Cr.App.1977); *Hooper v. State*, 494 S.W.2d 846 (Tex.Cr.App.1973).

Furthermore, in offering this impeachment evidence, appellant failed at all times to inform the court as to the reasons, if any, for the admissibility of this testimony. He did not explain that the testimony could possibly show bias or improper motive on the part of the witness Neel. In so failing, we hold that any error in excluding this testimony, which, as pointed out above, was not objected to, was waived. See *Luna v. Beto*, 395 F.2d 35 (5th Cir. 1968); *Adams v. State*, 577 S.W.2d 717 (Tex.Cr.App.1979); *Cloud v. State, supra; Garza v. State*, 532 S.W.2d 624 (Tex.Cr.App.1976).

Appellant's first two grounds of error are overruled.

Appellant next complains, in his third, fourth, and fifth grounds of error, of the trial court's refusal of a mistrial because of the alleged seizure of some notes made by defendant by a deputy sheriff who turned the notes over to the prosecution. Error is alleged by appellant, in ground of error No. 3, that the seizure violated appellant's right to counsel, in ground No. 4, that the seizure of the notes violated the work-product doctrine, and in ground No. 5, that the taking of the notes violated appellant's right against unreasonable searches and seizures.

Appellant's murder trial lasted slightly more than two weeks, or from May 30, 1978, to June 17, 1978. Appellant was in the custody of the sheriff all of this time. On the evening of June 14, 1978, the day

before the testimony in this case ended and both sides rested and closed, appellant left his notepad containing some notes he had made for his attorney during the trial in a deputy sheriff's car. Appellant at the time was being taken back to the jail from the courtroom and inadvertently left his notes in the deputy's car. There is no testimony whatever, and in fact no hint at all, that the sheriff's deputy or anyone else connected with the prosecution, actually took or seized the notes before appellant left them in the car.

Later that evening Mr. Jackson, appellant's lead counsel at the trial, discovered the notes were missing and tried to locate the deputy sheriff in whose car they had been left. He failed to locate this deputy and the record reveals that the notes were still in the car, right where they had been left by appellant, the following morning, June 15, 1978. Early that morning the deputy turned the notes over to his captain, who turned them over to Mr. Cobb, the chief prosecutor.

Later that same morning Mr. Cobb refused to turn the notes over to Mr. Jackson, appellant's attorney, even though Jackson requested several times that he do so. Also, on the same morning, after both sides had rested and closed, the court conducted a hearing concerning these notes. The court refused to describe this hearing as a bill of exceptions, but nevertheless both Mr. Cobb and Mr. Jackson testified on the matter of the notes. At no time was it shown that Mr. Cobb, or anyone in his office, or anyone in the sheriff's department, ever seriously perused or studied these notes. The chief prosecutor did admit, in response to a direct question, that he "took a look at it (the notepad)". He then said that "it was some notes made by somebody in connection with this trial". He said he did not know personally who made the notes but that "they told me it was made by the defendant (Gregory Ott)."

At the hearing on June 15, 1978, after all the testimony was in, appellant made no request specifically that the notes be returned to him, or that the court order the prosecutor to return them. At the conclusion of this hearing the notes were ordered sealed by the court and made a part of this record on appeal. There is no showing in this record that these notes, inadvertently turned over to the sheriff and the state, were ever used by the prosecutor in any manner after he "took a look at them". The contents of the notes were not used by the State to produce any evidence, they were not used by the State in its argument to the jury, or in any other manner. In fact, at no time during or after the hearing, were the contents of the notes disclosed. They were not introduced into evidence and no other reference was ever made to or about them. All the evidence shows with respect to the prosecutor's notes is that he "took a look at them". The notes were not seen by anyone representing the State until the morning of June 15, after being left in the car the night before. After the prosecutor saw the notes there was very little testimony adduced, and the notes were not used in any manner at that time or thereafter.

While we perceive no violation of any constitutional right and thus no error with regard to the detention of the notes by the sheriff and prosecutor after they were left by appellant, *under the specific facts of this case*, we do not condone or approve the action of either the prosecutor or the trial judge with respect to these notes. The notes should have been immediately returned to Mr. Jackson, defense attorney, by the prosecutor as soon as they were delivered to him by the sheriff's deputy around 8:00 a.m. on June 15, 1978. There should not have been any hesitation or reluctance to return these notes to their rightful owner. They had been made by appellant during his trial and they should have been returned to appellant or his attorney within minutes of their receipt by Mr. Cobb. Also, when the retention of appellant's notes by the prosecutor was called to the attention of the trial court on the morning of June 15, 1978, prior to the actual close of testimony, the judge should have forthwith, and without pause, ordered the prosecutor to return the notes. Elemental fairness and

justice required no less than the instantaneous return of these notes.

If the facts pertaining to the taking of the notes in this case were different, for instance if the notes had been left in possession of the sheriff or the prosecution earlier during the trial, and had been used in any manner by the prosecutor, we would have a different case.

■ Appellant's first contention regarding the notes, urged in his third point of error, is that appellant's right to counsel under the Federal and State Constitutions was violated because the attorney-client privilege was violated and because his right to effective assistance of counsel was infringed. We do not have a situation where appellant's right to consult and confer in private with his attorney was violated, or where the government, by surreptitious means, either through electronic surveillance between attorney and client, or by placing an informant in a position to learn defense strategy, intruded into the confidentiality and privacy between lawyer and client. Appellant cites many cases in his brief that demonstrate that anything of this nature would constitute a violation of a defendant's right to counsel, and these cases are not in point here.

Appellant would have this court compare this case to such cases as *U. S. v. Levy*, 577 F.2d 200 (3rd Cir. 1978); *U. S. v. Zarzour*, 432 F.2d 1 (5th Cir. 1970); and *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), which hold in general that the right to counsel is violated when law enforcement officers knowingly intercept confidential attorney-client communications and disclose these to the prosecution. The holdings in *Levy* and *Zarzour* turn on whether or not the intrusion was unlawful and for the sole purpose of determining defense strategy. That is just not the situation here. In *Zarzour* the United States Fifth Circuit Court of Appeals held that an intrusion by a government upon the confidential relationship between a defendant and his attorney, either through surreptitious electronic means or through an informant, is a violation of the Sixth Amendment right to counsel. The *Levy* case involved an informer who was placed in the defense camp by the prosecution who relayed information to the government's attorney.

In *U. S. v. Rosner*, 485 F.2d 1213 (2nd Cir. 1973), it was held that a finding of unlawful intrusion must be made before an intrusion into attorney-client talks would warrant a reversal under the Sixth Amendment. In *U. S. v. Fanning*, 477 F.2d 45 (5th Cir. 1973) the court held that there must be an intrusion between the relationship between a defendant and his attorney before there is a violation of the right to counsel and that more must be shown than an interchange between an attorney and the client on the one hand and an interchange between an attorney and the government agents on the other hand. Rather, the court said, the client must link the two together and show prejudice as a result thereof. In *Weatherford v. Bursey, supra*, the United States Supreme Court held that a mere showing of intrusion into the attorney-client conference is not sufficient to require reversal. The accused must show that in addition to the intrusion the substance of overheard conversation was of some benefit to the enforcement officials. See also *Mastrian v. McManus*, 554 F.2d 813 (8th Cir. 1977).

In this case there was no actual intrusion between the lawyer and his client. Neither the sheriff or the prosecutor took the notes from appellant; he voluntarily, though negligently, left them in a deputy sheriff's car. This was not an undercover, cloak and dagger scheme to obtain appellant's defense strategy. Further, as heretofore pointed out, the notes which did fall into the prosecutor's hands, were never used against the appellant in any manner by the prosecution. No harm or prejudice to appellant is shown. We hold there was no unlawful violation of the appellant's right to counsel.

■ Appellant's fourth ground of error asserts error on the part of the trial court in refusing his motion for mistrial because the "seizure" of the notes violated the work-product doctrine. He cites *U. S. v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141

(1975) for the proposition that the work-product doctrine in criminal cases shelters materials including memoranda, interviews, mental impressions and other materials assembled for use by the defense.

There is no question that there is a work-product doctrine, but for reasons already expressed, we do not think that that doctrine was violated in this case. There was no "sordid cloak and dagger scheme" as appellant suggests, or a flagrant disregard for due process evidenced in this case. The notes were not stolen or lifted from appellant by the sheriff or the prosecutor; they were voluntarily left in the deputy's car. There was no use of this material by the prosecutor and therefore no harm or prejudice to appellant was shown. Appellant seems to argue that the very retention of the notes by the prosecutor is so repugnant to our system of justice as to constitute a flagrant denial of due process. We have already condemned the retention of these notes by the prosecutor, but under the circumstances of this case, we do not think the work-product doctrine was violated or appellant's rights of due process impaired.

■ Appellant also contends, by his fifth ground of error, that the trial court erred in refusing to declare a mistrial because the "seizure" of the notes constituted an unreasonable search and seizure. In this respect, it should first be noted that appellant did not request a mistrial on this basis. Here, appellant was in police custody in the sheriff's car when he voluntarily left the notes in the car. Under these circumstances he cannot reasonably have any expectation of privacy in regard to discarded property, and therefore any search and seizure would not be unreasonable. *U. S. v. Maryland*, 479 F.2d 566 (5th Cir. 1973); *Alvarez v. State*, 508 S.W.2d 100 (Tex.Cr.App.1974). The issue is not actually abandonment in the strict property right sense, but whether the person affected by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he no longer retained a reasonable expectation of privacy with regard to it at the time of the search. *U. S. v.*

*Williams*, 569 F.2d 823 (5th Cir. 1978); *U. S. v. Stumes*, 549 F.2d 831 (8th Cir. 1977). It is highly questionable that under the facts of this case there was any actual search and seizure. The notes were not seized; they were, in effect, delivered to the sheriff. There is no showing that the notes were carefully inspected or studied and there is absolutely no showing that they were used against appellant. We hold that any search and seizure here was not unreasonable or a violation of appellant's constitutional rights.

Appellant's third, fourth, and fifth grounds of error are overruled.

By grounds of error numbers six through nineteen appellant complains of the trial court excusing fourteen venirepersons from jury service for what he calls economic reasons prior to trial on the court's own motion in the absence of counsel. The record shows that on several different days prior to May 30, 1978, when jury selection for this murder trial actually began, the trial court did excuse on his own motion various people for different reasons, some of which were related to business matters. All of these excuses were granted by the court, without the presence of counsel, on two days immediately preceding the seating of a jury panel on May 30, 1978. All of these excuses were granted by the court after the venirepersons signed affidavits, filed with the clerk, which gave their reasons for requesting to be excused from jury service for the week of May 30, 1978, when this case was set for trial.

The fourteen excuses granted which were made the basis of appellant's grounds of error numbers six through nineteen were all based on business reasons. For example, two of these prospective jurors told the court in their affidavits that they worked in the same three person office and had to prepare monthly reports which were due on June 2, 1978, which could not be done if they were compelled to serve on the Ott Jury. Jurors McConnell, Mitchell, Matthews, and Zerbe all had to be at the Dallas apparel mart in Dallas during the week in question. Two of these people, Mitchell and Zerbe, actually worked at the Dallas Mart

five times a year including the week of the trial. One prospective juror, Carrel, said in his affidavit that he was working temporarily in Lubbock, Texas, installing telephone switching equipment and that no replacement was available. Venireman Johnson had a business trip out of town scheduled for that week, as did venireman Lowery, whose trip to Kentucky had been planned for a year. Juror Pelzel had a business trip to Sao Paulo, Brazil, scheduled which he could not cancel. Juror Widder had a business convention trip to Hammond, Indiana, scheduled, which was required by her employer. Juror Fleck said in his affidavit that he was out of work and would be out of state looking for a job.

It is appellant's contentions in these grounds of error that these fourteen jurors were excused for economic reasons in violation of Article 2120 V.A.C.S. which reads:

> "The court may hear any reasonable excuse of a juror, and may release him entirely or until some other day of the term provided, however, the court shall not excuse any juror for economic reasons unless all parties of record are present and approve such excuse."

It must be remembered that these fourteen jurors were excused by the court prior to the time the jury panel was called for trial in this case. However, even though jury selection began on May 30, 1978, appellant did not object to the excusing of these venirepersons until the following day, May 31, 1978, when he simply objected to the "excusing of the jurors by the court", without stating a specific reason for his objection. His objection is not the one made in his brief on appeal, that the jurors were excused for economic reasons. Any objection to the excusing of these jurors was therefore waived. *Chambers v. State*, 568 S.W.2d 313 (Tex.Cr.App.1978).

Appellant did not, prior to the start of jury selection, ask for attachment of any venireperson until June 1, 1978, several days after the fourteen jurors were excused, and after jury selection had commenced on May 30. Neither did appellant ever file a motion to quash the jury panel. Appellant contends that under V.A.C.C.P., article 35.07 a party may challenge the array only on the ground that the officer summoning the jury has willfully summoned jurors with a view to securing a conviction or an acquittal. However, appellant is complaining of a violation of a civil statute and there is no such provision or requirement under this statute.

By failing to timely ask for attachment of the jurors excused for business reasons and by failing to file a motion to quash the jury panel, appellant, also waived error, if any, in the trial court's excusing of these jurors. See *White v. State*, 591 S.W.2d 851 (Tex.Cr.App.1980); *Ward v. State*, 505 S.W.2d 832 (Tex.Cr.App.1974); and *Dent v. State*, 504 S.W.2d 455 (Tex.Cr.App.1974).

In *Dent v. State, supra*, one of the complaints raised by appellant was that the court excused certain members of a jury panel for economic reasons. Appellant's motions to quash the jury panel were presented after the members were excused. The Court of Criminal Appeals said:

> "It is our conclusion that such action did not constitute a sufficiently prompt and timely demand such as to bring the above quoted rule into operation. Absent such demand, reversal would be warranted in this case only upon a showing that appellant was injured by the error complained of. No such injury is alleged or shown."

In *Ward v. State, supra*, appellant contended that the trial court had erred in its granting an indiscriminate excuse to veniremen from service. The court held that since appellant made no effort to attach the absent jurors in compliance with V.A.C.C.P. articles 35.01, 35.07 he was not entitled to complain with respect to excusing such prospective jurors.

The case of *White v. State, supra*, is very similar to this case. In *White*, appellant complained of the trial court excusing five prospective jurors for the week for "economic reasons" in violation of V.A.C.S. article 2120. Appellant objected to the action of the court on the grounds that the jurors had been excused for economic reason, and

the objection was overruled. Appellant made no effort to attach these prospective jurors. He did file a motion to quash the jury panel, but it was not supported by affidavit as required by V.A.C.C.P. article 35.07 and a ruling on the same was apparently not obtained. The court in *White* held that error was not presented, and cited *Ward v. State, supra.*

██ We think *White* is controlling here for the reason that the jurors in that case were excused for the same type of business reasons for which the court in this case excused the prospective jurors. In *White* one juror was excused to attend a medical meeting in another city; two were excused to a later day in the term because their vacations had been set by their employers for the week the *White* case was to be tried; one was excused until a later day because he was a construction superintendent and the trial week was a critical stage of his construction project; one was excused to a later day because two of the six people in his office were already off the job and his absence for jury service would reduce the work force to one-half. It was held that no violation of article 2120 was shown:

> "While the excuses offered by the five prospective jurors were jobrelated, there is no showing that jury service for any of these individuals would have resulted in the loss of a job, loss of compensation, salaries, wages, etc., the suffering of a financial burden or other economic consequences. We do not conclude that they were excused for economic reasons."

We have the identical situation in this case. The fourteen jurors here were all excused for reasons relating to their business or work, as was true in *White*, but, as was also true in *White*, there was no showing of loss of compensation, salaries, wages, or loss of a job. There was no showing of a financial burden or of other economic consequences. *The affidavit form itself, signed by each person, stated that the excuse sought was not for economic reasons.* We hold that these jurors were not excused for economic reasons in violation of the statute.

We think it important to note that the problems of jurors, presented to the trial judge in this case, are somewhat typical and exist in every county in which juries are selected. While jury service is vital and essential, and while most citizens of this state are aware of this, some people called for jury service on relatively short notice, simply have insurmountable problems in serving in a particular week that must be recognized by the trial judge.

Prior commitments of jurors, made sometimes weeks and months before their call to duty, are extremely difficult, if not impossible, to change or postpone. To do so, in many cases, would work severe hardship on the very people on which the jury system in this state depends. The trial court must be allowed some leeway and authority to use some judgment in excusing jurors entirely or in postponing jury service for those individuals. Moreover, appellant has not shown any harm or prejudice to him as the result of the excusing of these fourteen jurors. The record reveals that when the jury was finally selected, the State had exercised only seven of its fifteen peremptory challenges and the defendant, who had been given three additional strikes, had one peremptory challenge remaining. There is no showing that appellant was compelled to accept an objectionable juror. *Escalante v. State*, 394 S.W.2d 518 (Tex.Cr.App.1965).

Appellant's grounds of error six through nineteen are overruled.

██ Appellant's grounds of error twenty through twenty eight complain of the trial court's excusing, prior to trial, nine prospective jurors so that they could go on vacation. The affidavits of these nine excused persons are in the transcript in this case and they all show that these jurors had had vacation plans made long prior to their summons to jury duty. The court, prior to the time jury selection in this case actually began, granted these excuses on those grounds. Appellant concedes that the trial court may excuse jurors entirely for any reasonable purpose or may postpone their service to another term of court, but he

argues that this discretion was abused by the trial judge. We think not. The trial court under V.A.C.S. art. 2120 may "hear any reasonable excuse of a juror and may release him entirely or until some other day of the term . . ." The trial judge in this case, under the circumstances presented by the jurors and their affidavits, felt that the request to consummate vacation plans, long made, was a reasonable excuse. He had the authority and discretion to grant these requests and to either entirely excuse or to postpone the service to another week. *Bouchillon v. State*, 540 S.W.2d 319 (Tex.Cr. App.1976). These grounds of error are overruled.

▇▇ Appellant next contends, in grounds of error twenty nine through thirty three, that the trial court erred in granting the requests of five male jurors for an exemption on the ground that they had legal custody of a child or children under the age of ten years. He asserts that this action of the court was a violation of V.A. C.S. art. 2135, sec. 2 which at that time (1978) provided that all females who have legal custody of a child or children under the age of ten years were exempt from jury service. This article was amended in 1979 so that at the present time V.A.C.S. art. 2135, sec. 2 now exempts from jury service:

"All persons who have legal custody of a child or children under the age of ten years if jury service by that person would necessitate leaving the child or children without adequate supervision."

We do not think the trial court committed error in exempting these five males from jury service for the week in question. Even though V.A.C.S. art. 2135, sec. 2 at the time in question applied only to females, the court had ample authority and discretion under V.A.C.S. art. 2120, and V.A.C.C.P. art. 35.03 to excuse these jurors.

In *Johnson v. State*, 548 S.W.2d 700 (Tex. Cr.App.1977) it was claimed that V.A.C.S. art. 2135, sec. 2 was unconstitutional. The court, in rejecting this contention, said:

"Therefore, even by today's standards, we find that the exemption in section 2 of article 2135, V.A.C.S. is reasonable. If women who are primarily engaged in the care of their children under age ten were not granted this exemption they would have to personally and individually present any claims of hardship to the court under article 35.03, V.A.C.C.P. Therefore, we find that the State has a legitimate interest in creating this optional exemption because it allows those persons most likely to have a legitimate claim of hardship to present it in an orderly manner."

The inference in *Johnson* is clear that women who had the care and custody of children under ten, if V.A.C.S. art. 2135, sec. 2 did not exist, could be excused from jury service upon a showing of sufficient reason to be excused under V.A.C.C.P. art. 35.03. Certainly, if women can be excused under V.A.C.C.P. art. 35.03 by showing hardship because of child care problems, men also could be excused for the same reasons under the same statute. The same is true, we think, under V.A.C.S. art. 2135.

▇▇ We also hold that under V.A.C.S. art. 2135, sec. 2, as it existed in 1978, while the term "females" was used, that the legislature did not intend by such language to exclude males, if it were shown that a male actually had the care, custody and control of a child or children under ten years of age and had the same problems in caring for that child if he were required to perform jury service as a woman would. We think that intent is indicated and was demonstrated by the legislature's action in 1979 in amending the statute.

Appellant's grounds of error numbers twenty nine through thirty three are also overruled.

▇▇ Appellant next asserts error, by his ground of error number thirty four, in the instruction by the trial court in the court's charge that "it is unlawful to knowingly or intentionally possess a usable quantity of marihuana" because the instruction constituted a comment on the weight of the evidence. It is appellant's position that the instruction implied that the appellant did unlawfully possess marihuana and that the judge so believed.

It should be recalled that on the late evening of February 20, 1978, six peace

officers went to appellant's residence near Argyle, Denton County, Texas, after being informed that appellant was selling marihuana. Shortly after their arrival, after appellant was alerted as to the presence of persons other than himself, James Leonard Baker, the informer, and undercover agent Ben Neel, appellant fired one shot from a thirty eight caliber pistol and agent Neel also fired one shot. Although appellant did not testify, the circumstances raised the possibility of self defense of property by appellant and the court quite properly charged the jury on the right of defense to the lawful possession of land or of tangible, movable property. The question of rightful defense of real and personal property was raised by the evidence and the court gave a proper charge on this element of law. Appellant, of course, raised no objection to this instruction.

Immediately following the charge on the use of force and deadly force in defense of real and personal property, the court instructed the jury as follows:

"You are instructed that it is unlawful to knowingly or intentionally possess a usable quantity of marihuana."

We think that this charge, following the instruction on the lawful defense of real and tangible, movable property, was not only proper, but was necessary to inform the jury that the defense of possession of marihuana would not be proper or lawful. Such instruction was not an improper comment on the weight of the evidence, any more than the instruction on the defense of property, which was favorable to appellant and in accordance with the evidence, was an improper comment. The trial court was not telling the jury that appellant did unlawfully possess marihuana and that he, the trial judge, so believed.

The evidence that there was marihuana in appellant's barn on his Denton County premises, and that appellant brought it from the barn into the house to sell to undercover agent Neel, was uncontroverted. The marihuana found on appellant's premises the night of February 20, 1978, was introduced into evidence. There was no evidence from any witness to refute the presence of marihuana in the possession of appellant. The court, in its charge, simply told the jury, in effect, that it was lawful to defend real or tangible, movable property, but that it was unlawful to knowingly possess a usable quantity of marihuana. This did not constitute a comment on the facts of the case, or what the facts were. It merely told the jury what the law is. The facts were left for the determination of the jury and the court in no way told them what to believe.

Appellant's thirty fourth ground of error is overruled.

In his thirty fifth ground of error appellant complains of the trial court's allowing the introduction into evidence of certain items seized from appellant's residence in the early morning hours of February 21, 1978, following the shooting at approximately 11:30 p.m. on February 20, 1978. The record shows that from the time of the shooting at approximately 11:30 on the night of February 20, 1978, until 5:00 a.m. on February 21, 1978, various officers seized articles from appellant's house such as the pistol owned by appellant, a .45 caliber cartridge case, 5 cartridges found in the pistol, a door and other articles. All of these items were introduced into evidence. The search of appellant's house and the seizure of these items was without a warrant.

Appellant relies on *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), in support of his contention that the warrantless search of the scene of the shooting was unconstitutional. In *Mincey*, the Supreme Court of the United States held that there is no "murder scene exception" to the Fourth Amendment and that the warrantless search of a defendant's apartment was not constitutionally permissible simply because a homicide had recently occurred there. Prior to the decision on June 21, 1978, of *Mincey*, the law was that the common law "exigency rule" allowed such homicide investigations. *Tocher v. State*, 501 S.W.2d 921 (Tex.Cr.App.1973); *Brown v. State*, 475 S.W.2d 938 (Tex.Cr. App.1972).

**230**

However, since both the search involved in this case and the trial of the case occurred before *Mincey* was decided, the rule of *Mincey* is not applicable to this case. In *Pearson v. State*, 587 S.W.2d 393 (Tex.Cr. App.1979), it was held in a case where the search and the trial of the case occurred prior to the decision in *Mincey*, that that decision would not be held to be retroactive and that *Mincey v. Arizona, supra*, did not apply. In *Swink v. State*, 617 S.W.2d 203 (Tex.Cr.App.1981), the search was conducted some six months before the decision in *Mincey* while the trial was held six months after the decision. The Court of Criminal Appeals said in *Swink* that at the time of the search in that case the common law "exigency rule" followed in *Tocher v. State* and *Brown v. State, supra*, still prevailed and such homicide scene investigations were still permitted. Again, the Court of Criminal Appeals, refused to apply *Mincey* retroactively and held that it did not apply to the warrantless search in *Swink*. Here, the search in question occurred on February 20, 1978, and the trial was held from May 30, 1978, to June 17, 1978.

We hold that *Pearson v. State, supra*, and *Swink v. State, supra*, control the disposition of appellant's thirty fifth ground of error, which is accordingly overruled.

The judgment of the trial court is affirmed.